## STATE OF CONNECTICUT *v.* BUNTHAN SAM
(AC 25795)

DiPentima, Rogers and Mihalakos, Js.

---

Argued May 25—officially released October 10, 2006

*Emily Dean*, certified legal intern, with whom were *Timothy H. Everett*, special public defender, and, on the brief, *Todd D. Fernow*, and *Peter Brown*, *Audrey Staropoli*, *Joseph Sconyers* and *James Wood*, certified legal interns, for the appellant (defendant).

*Frederick W. Fawcett*, supervisory assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Joseph J. Harry*, senior assistant state's attorney, for the appellee (state).

*Opinion*

MIHALAKOS, J. The defendant, Bunthan Sam, appeals from the judgment of conviction, rendered following a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3), burglary in the first degree in violation of General Statutes § 53a-101 (a) (2), assault in the second degree in violation of General Statutes § 53a-60 (a) (2), assault in the third degree in violation of General Statutes § 53a-61 (a) (1), and two counts of unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a).[1] On appeal, the defendant claims that the trial court improperly (1) deprived him of his constitutional rights (a) to be present at a critical stage of his prosecution and (b) to have conflict free counsel, (2) failed to instruct the jury adequately and (3) violated his fifth amendment right

---

[1] The defendant was acquitted of conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54 (a). The defendant received a total effective sentence of ten years incarceration.

against self-incrimination. The defendant also claims that the evidence was insufficient to convict him of robbery in the first degree and assault in the second degree. We conclude that there was sufficient evidence to convict the defendant, but agree with his first claim and, accordingly, reverse the judgment of the trial court.[2]

The following facts are relevant to the defendant's appeal. Shortly before 2 a.m. on October 30, 2003, the defendant, accompanied by his brother, Chandara Sam, and their friend, Vesna San, arrived at the home of Stanley D'Amato. The defendant, standing alone at the front door, rang the doorbell and asked Diane D'Amato, Stanley D'Amato's mother, if Stanley D'Amato would come to the door. When Stanley D'Amato arrived at the door, the defendant confronted him regarding an ongoing dispute between the defendant and Chandara Sam, and Stanley D'Amato's friend, Sandap Pauv. Chandara Sam and San then approached the house and joined in the confrontation. Stanley D'Amato asked the men to leave his home. Diane D'Amato, who was in the living room at the time, picked up a cordless telephone and dialed 911.

Noticing her call for help, San entered the house, grabbed the telephone from her, pushed her onto the couch and began beating her with the telephone. When Stanley D'Amato ran to his mother's aid, he was restrained by Chandara Sam, who forced him face down onto the couch. Both the defendant and Chandara Sam then physically attacked Stanley D'Amato. The incident was brief, and all three men ran from the house before

---

[2] Because we agree with the defendant's first claim of trial court impropriety, we do not address his claims alleging improper jury instruction and a violation of his fifth amendment right against self-incrimination. See *State v. Peeler*, 265 Conn. 460, 463, 828 A.2d 1216 (2003), cert. denied, 541 U.S. 1029, 124 S. Ct. 2094, 158 L. Ed. 2d 710 (2004). We do, however, reach the defendant's claims of insufficiency of the evidence. See footnote 14.

the arrival of the Bridgeport police. The cordless telephone used in the attack never was recovered. After the men had fled, Stanley D'Amato noticed that he was bleeding. He was admitted to Bridgeport Hospital at approximately 2:20 a.m., where Michael Werdmann, a physician, treated him for two lacerations, one to his chest and one to his right calf. Additional facts will be set forth as necessary.

I

The defendant's first claim on appeal is that the court's inadequate inquiry into his defense counsel's potential conflict of interest violated his rights under the United States constitution. Specifically, the defendant maintains that the court (1) committed a structural error when it excluded the defendant from an in camera conference regarding the potential conflict of interest, depriving him of the right to be present at a critical stage of his prosecution, and (2) failed to remedy an actual conflict of interest. We agree with the defendant that the court improperly deprived him of the right to be present at a critical stage of his prosecution and that the deprivation amounted to a structural error warranting reversal of his conviction.

The record discloses the following additional undisputed facts and procedural history relevant to the defendant's first claim. The defendant and Chandara Sam, both arrested and charged following the incident, each retained attorney Jonathan Klein to represent them in the matter. Klein had represented the two brothers in previous criminal matters. Klein served as counsel in the present case for both the defendant and Chandara Sam from the time of their first appearances on November 7, 2003, until just prior to jury selection on March 9, 2004.

On March 9, 2004, before the start of jury selection, the court raised the issue of Klein's dual representation

of the codefendants. The court addressed the defendant and Chandara Sam and inquired of them whether Klein had informed them of the potential problems inherent in joint representation. The record reflects that Chandara Sam answered in the affirmative but that the defendant gave no response.[3] The court also asked whether they understood that each was entitled to his own independent counsel, to which both the defendant and Chandara Sam answered, "Yes."[4] The court asked the

---

[3] Specifically, the following exchange occurred:

"The Court: . . . Let me just ask, both of you are represented by Mr. Klein; is that correct?

"[The Defendant]: Yes.

"[Chandara Sam]: Yes.

"The Court: He has gone over the facts with you in the case, and obviously he has told you that you could have—the court could—if you couldn't afford it, appoint another attorney for you; you understand that, right? You have to say yes or no.

"[Chandara Sam]: Yes.

"The Court: Sir, is that correct?

"[Chandara Sam]: Yes.

"The Court: Okay. Has he fully explained to you the circumstances and the potential problems with joint representation?

"[Chandara Sam]: Yeah.

"The Court: I didn't hear you; you have to say something.

"[Chandara Sam]: Yes.

"The Court: Okay. The—the thing that's important to remember is that nothing that we do during the course of the trial is—you can't plan for every contingency, so there may be situations that would come up where one of you could be—could be in more trouble during the course of the trial with the testimony than the other. And one of you may decide to testify, but your testimony would help yourself but hurt your brother, if you know what I mean. You follow what I'm saying?

"[Chandara Sam]: Yeah."

[4] The court stated the following:

"The Court: And I don't know anything about the case. The judges don't, you know, we don't know, I haven't read anything about it yet or anything like that. I can only tell you as it unfolds, I want to make sure that I don't develop what we call a conflict of interest for this lawyer. Because one of the things that's important to remember is, each of you would be entitled to your own independent counsel; you understand that?

"[Chandara Sam]: Yes.

"The Court: You understand that, sir?

"[The Defendant]: Yes."

prosecutor whether he could foresee any conflict of interest problems regarding Klein's representation of both defendants, and the prosecutor responded that he did see a potential problem. The prosecutor informed the court that Chandara Sam had made a written statement denying any wrongdoing in the incident and that the state was contemplating the use of that statement at trial. Chandara Sam's statement, the prosecutor explained, mentioned the defendant's name throughout; it placed the defendant at the scene at the time of the incident and referred to a plan in which the defendant had participated. Following the prosecutor's remarks, Klein notified the court that he had failed to obtain conflict of interest waivers from the defendant and Chandara Sam for his representation of them in the present matter.[5] After receiving this information, the court thanked the attorneys for their candor and stated that it would hold a recess so that the defendants could change their clothing prior to the selection of a jury.

During the recess, outside the presence of the defendant and Chandara Sam, the court conferred with counsel regarding Klein's dual representation. When the recess had concluded, the court began by stating the following: "After discussion with counsel and the state's attorney, and after listening to the presentation of defense counsel, I thought that under the circumstances, it would be appropriate to sever the trial of [the defendant] and Chandara Sam. And it's my understanding that we're going to proceed with the trial of [the defendant], who is represented by Mr. Klein." The court then instructed Chandara Sam to obtain new counsel.[6]

---

[5] Klein informed the court that although he previously had obtained conflict of interest waivers from the defendant and Chandara Sam, those waivers were from his representation of the two brothers in a prior criminal matter.

[6] The court seemed to have recognized that Chandara Sam was concerned about Klein's conflict of interest in representing both him and the defendant, stating: "And Mr. Chandara Sam . . . I—and I'm glad you—when I talked to you in court, you know, I got the idea you were a little fuzzy on this and

Immediately following the court's ruling, Klein informed the court that the defendant had just disclosed to him that he also wanted to be represented by new counsel. The court canvassed the defendant regarding his desire to obtain new counsel. The defendant told the court that he no longer wanted to have Klein represent him. When the court asked why, the defendant stated: "I don't feel that I have a fair trial because I still owe him $7000 something dollars. I don't—I want a new lawyer, that's why." The court did not accept this reason as sufficient, explaining to the defendant that Klein was obligated to provide him with effective representation regardless of a money debt.

The court then asked the defendant whether he could think of any other reason why he did not want Klein to represent him, to which the defendant replied, "I just don't feel comfortable with him representing me," and stated that he also was concerned that some of the information Klein had told him about the case was not true, referring specifically to a letter from Klein telling him that the case had been transferred to New Haven when it had not been. The court assured the defendant that Klein had not misinformed him and that the case had been transferred to New Haven but subsequently was transferred back to Bridgeport.

The court asked the defendant again if he had any other concerns, but as the defendant started to answer, the court interrupted him, stating: "Well, I have every reason to believe that Mr. Klein—I have no reason to believe that he would not—he has been in this case for some time, you're in custody, it's important that you're—get your day in court. And I am sure that I

you weren't too enthused about, you know, you could see some problems coming, which was smart, all right. I'm going to sever these trials for purposes of trial. And do you want to get your own private counsel? Do you have funds for it or do you want to make arrangements to have a court-appointed attorney?"

will—that Mr. Klein will pursue this, your defense, as vigorously as possible and I expect the same. And I have no reason to believe that he would not do that. Okay." The defendant spoke up and stated yet another reason why he no longer wanted to be represented by Klein: "[Because] on the paper he said that I'm going to lose [the] trial, that's why . . . ." The court responded by stating with respect to Klein, "He'll do the best job he can. You're entitled to get your trial, and you're going to get it. You're not interested in pleading guilty, is that right? . . . All right, then, that's simple, you get a trial. Bring the panel in, please."

The defendant claims that the undisputed facts show that the court, informed of a potential conflict of interest, conducted an in chambers, off the record meeting with Klein and the prosecutor, during which the potential conflict of interest was discussed. He maintains that, pursuant to our Supreme Court's holding in *State* v. *Lopez*, 271 Conn. 724, 859 A.2d 898 (2004), the in camera inquiry into the conflict of interest of defense counsel constituted a "critical stage of the prosecution" and that the exclusion of the defendant amounted to a structural error mandating reversal of the defendant's conviction.[7]

In response, the state asserts that *State* v. *Lopez*, supra, 271 Conn. 724, is distinguishable from the present case because (1) in *Lopez* the meeting occurred during the testimonial phase of trial, whereas, in the present case, the jury had not yet been sworn and (2) in *Lopez*, the court failed to put on the record the contents of the in camera meeting, whereas, here, the court's subsequent canvassing of the defendant was sufficient to inform the defendant of the conflict and give him an opportunity to respond.

---

[7] We note that the defendant makes no claim that he was deprived of his constitutional right to counsel of his choosing. See *United States* v. *Gonzalez-Lopez*, 548 U.S. 140, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006).

We begin with a discussion of the pertinent legal principles that guide our resolution of this issue. The claims raised by the defendant present questions of law that we review de novo. Id., 731. "The sixth amendment to the United States constitution as applied to the states through the fourteenth amendment . . . guarantee[s] . . . a criminal defendant the right to effective assistance of counsel. *Powell* v. *Alabama*, 287 U.S. 45, 69, 53 S. Ct. 55, 77 L. Ed. 158 (1932); *Festo* v. *Luckart*, 191 Conn. 622, 626, 469 A.2d 1181 (1983). Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest. *Wood* v. *Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981). *Festo* v. *Luckart*, supra, 626–27. This right requires that the assistance of counsel be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests. *Glasser* v. *United States*, 315 U.S. 60, 70, 62 S. Ct. 457, 86 L. Ed. 680 (1942); *State* v. *Marion*, 175 Conn. 211, 216, 397 A.2d 533 (1978)." (Internal quotation marks omitted.) *State* v. *Vega*, 259 Conn. 374, 385–86, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002).

"There are two circumstances under which a trial court has a duty to inquire with respect to a conflict of interest: (1) when there has been a timely conflict objection at trial . . . or (2) when the trial court knows or reasonably should know that a particular conflict exists . . . ." (Internal quotation marks omitted.) *State* v. *Cator*, 256 Conn. 785, 793–94, 781 A.2d 285 (2001). "To be meaningful, an inquiry must be thorough and searching." *Festo* v. *Luckart*, supra, 191 Conn. 628.

In the present case, the court was made aware of a particular conflict of interest in Klein's representation of both the defendant and Chandara Sam. The court, therefore, had a duty to inquire about the conflict. We

agree with the defendant that the statements made by the court immediately preceding and following the recess indicate that the court, during that recess, conducted an off the record meeting with Klein and the prosecutor to inquire into the conflict of interest.[8] It also is apparent that Klein made certain representations during the inquiry and that the court made its decision that Klein would continue to represent the defendant on the basis of the information it received in that meeting.

Our Supreme Court acknowledged in *State* v. *Lopez*, supra, 271 Conn. 731, that an in camera inquiry regarding a potential conflict of interest may constitute a critical stage of a prosecution at which a defendant has a constitutional right to be present. *Lopez*, much like the present case, involved a defendant's challenge to the adequacy of the trial court's inquiry into a possible conflict between the defendant and his trial attorney. There, the defendant was convicted, following a jury trial, of three counts of the crime of risk of injury to a child. Id., 725–26. The victim in the case, prior to trial, met with the defendant's attorney, signed a statement recanting her accusations against the defendant and informed the attorney that her statement was true. Id., 728–29. At the defendant's trial, however, the victim testified that she had been forced to make the recantation and that it was not the truth. Id., 729. Some time after the victim delivered this testimony, the prosecutor expressed to the court, off the record and without the defendant present, a concern that defense counsel would testify on behalf of the defendant. Id. The trial

---

[8] The only issue discussed on the record prior to the recess was Klein's potential conflict of interest. Immediately after proceedings resumed following the recess, the court stated: "After discussion with counsel and the state's attorney, and after listening to the presentation of defense counsel, I thought that under the circumstances, it would be appropriate to sever the trial of [the defendant] and Chandara Sam. And it's my understanding that we're going to proceed with the trial of [the defendant], who is represented by Mr. Klein." See footnote 7.

court held a meeting, in chambers and off the record, to discuss the matter. Id. At the meeting, the defendant's attorney assured the court that he did not intend to testify on behalf of the defendant. Id. On the basis of that affirmation, the court permitted him to continue representing the defendant. Following the defendant's conviction, his new counsel made a motion for a new trial, alleging that the defendant had been deprived of conflict free representation, which was denied by the court.[9] Id., 728–29.

On appeal, our Supreme Court determined that the exclusion of the defendant from the in camera conference violated his right to be present during a critical stage of his prosecution. *State* v. *Lopez*, supra, 271 Conn. 731. In reaching that conclusion, the court emphasized: "[A] fundamental tenet of criminal jurisprudence [is that] a criminal defendant has a constitutional right to be present at all critical stages of his or her prosecution. *Rushen* v. *Spain*, 464 U.S. 114, 117, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983) (right to personal presence at all critical stages of trial and right to counsel are fundamental rights of each criminal defendant). Indeed, [a] defendant's right to be present . . . is scarcely less important to the accused than the right of trial itself. . . . [C]ourts have recognized that this right is protected by the due process clause in situations when the defendant is not actually confronting witnesses or evidence against him. *Snyder* v. *Massachusetts*, 291 U.S. 97, 105–106, 108, 54 S. Ct. 330, 78 L. Ed.

---

[9] Initially, the defendant appealed to this court. See *State* v. *Lopez*, 80 Conn. App. 386, 835 A.2d 126 (2003), aff'd, 271 Conn. 724, 859 A.2d 898 (2004). This court concluded, inter alia, that the trial court, having been made aware of a potential conflict of interest, failed to conduct an adequate inquiry because, although it considered how the conflict would be handled, the court did not inquire into the actual nature of the conflict itself. Id., 392–93. We concluded, also, that there was "an *actual* conflict as a result of defense counsel's position as a material witness in the case." (Emphasis in original.) Id., 397–98.

674 (1934); see *State* v. *Jarzbek*, 204 Conn. 683, 691–92, 529 A.2d 1245 (1987) (recognizing that right to be present similarly is guaranteed by article first, § 8, of our state constitution), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988)." (Citation omitted; internal quotation marks omitted.) *State* v. *Lopez*, supra, 732.

The *Lopez* court explained that "[i]n judging whether a particular segment of a criminal proceeding constitutes a critical stage of a defendant's prosecution, courts have evaluated the extent to which a fair and just meeting would be thwarted by [the defendant's] absence or whether his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge. *Kentucky* v. *Stincer*, 482 U.S. 730, 745, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987)." (Internal quotation marks omitted.) *State* v. *Lopez*, supra, 271 Conn. 732. In concluding that the defendant in *Lopez* was deprived of his constitutional right to be present, the court stated: "In order for the defendant to have had adequate knowledge of the potential implications of the conflict and for him to have had a fair opportunity to question the sufficiency of the inquiry or to have objected to [defense counsel's] representation of the defendant's interests, he would have had to have been present during the proceeding. This was not a situation in which the defendant could have contributed nothing had he been at the inquiry, nor can we state with any degree of confidence that he would have gained nothing by attending. See *Snyder* v. *Massachusetts*, supra, 291 U.S. 108." *State* v. *Lopez*, supra, 271 Conn. 737.

We conclude that, as in *Lopez*, the defendant in this case was excluded from a critical stage of his prosecution.[10] The conflict of interest in the present case

[10] We are not persuaded by the argument made by the state that, in this case, the in camera meeting did not amount to a critical stage of the defendant's prosecution because it was conducted prior to the swearing in of the

involved the divergent interests of the defendant and Chandara Sam and the duty of loyalty owed to each of them by Klein. This conflict of interest was related substantially to the defendant's opportunity to defend himself because Klein's representation of him could have been hindered by the conflict.[11] As in *Lopez*, this was not a situation in which the defendant would have contributed nothing or gained nothing had he been at the inquiry. The defendant was entitled to hear any representation made by Klein regarding the conflict. Had the defendant been present at the meeting, he may have been able to articulate with greater clarity his objection to having Klein continue to represent him.

In *Lopez*, the trial court declined to conduct any inquiry on the record regarding the conflict of interest. *State* v. *Lopez*, supra, 271 Conn. 729. The Supreme Court, in reviewing the trial court's refusal to conduct any inquiry on the record, made the distinction between the court's conduct in that case and "cases in which the existence of an in-chambers conference subsequently is put on the record in open court with the defendant present, thereby affording him the chance either to object or to waive any objection to his having been absent from that conference . . . ." (Citation omitted.) Id., 737 n.13. The state rightfully points out that in the

jury. Such a distinction is not determinative of what constitutes a critical stage of a defendant's prosecution. For example, the federal circuit courts of appeal have held that a defendant's plea withdrawal, made prior to the swearing in of the jury, constitutes a critical stage of a defendant's prosecution at which a defendant has a right to counsel under the sixth amendment. See *Hines* v. *Miller*, 318 F.3d 157, 166–67 (2d Cir.) (Winter, J., dissenting) (citing examples), cert. denied, 538 U.S. 1040, 123 S. Ct. 2089, 155 L. Ed. 2d 1075 (2003).

[11] Klein, due to his continuing duty of loyalty to Chandara Sam, potentially was limited from pursuing particular plea negotiations or presenting an alibi defense on behalf of the defendant. The actual limitations on his ability to represent the defendant adequately, on the basis of the limited record before us, are unknown, a result of the fact that the hearing was conducted off the record.

present case, unlike in *Lopez*, the court did in fact make a statement in open court disclosing that an in camera meeting was held outside the defendant's presence. The court in the present case stated: "After discussion with counsel and the state's attorney, and after listening to the presentation of defense counsel, I thought that under the circumstances, it would be appropriate to sever the trial of [the defendant] and Chandara Sam. And it's my understanding that we're going to proceed with the trial of [the defendant], who is represented by Mr. Klein." We do not believe, however, that the present case constitutes a situation in which the defendant was informed adequately of the in camera meeting, thereby affording him the chance to object.

When a defendant is made aware that a meeting was conducted in his absence, his failure to object to his right to be present may be deemed a waiver of that right. *United States* v. *Gagnon*, 470 U.S. 522, 528–29, 105 S. Ct. 1482, 84 L. Ed. 2d 486 (1985). A waiver can be implied from the defendant's conduct, but it always must be knowing and voluntary. *United States* v. *Jones*, 381 F.3d 114, 122 (2d Cir. 2004), cert. denied, 543 U.S. 1072, 125 S. Ct. 916, 160 L. Ed. 2d 808 (2005). The defendant must be made aware of "the *nature* of the proceeding, not the abstract existence of the right itself." (Emphasis added.) *Cohen* v. *Senkowski*, 290 F.3d 485, 493 (2d Cir. 2002), cert. denied, 537 U.S. 1117, 123 S. Ct. 879, 154 L. Ed. 2d 794 (2003).

We conclude that the court's statement did not constitute sufficient notice to the defendant such that we could infer a waiver of his right to be present at the in camera meeting to discuss the conflict of interest. Although the court informed the defendant that a meeting had taken place outside his presence, it stated only that a discussion took place, not that the inquiry was regarding Klein's conflict of interest. Because the defendant was not made aware of the specific nature of the

proceeding, he was unable to make a knowing and voluntary waiver of his right to be present.

Because the defendant did not waive his right to be present at the in camera inquiry into the conflict, the court was required to set forth, on the record, the contents of the meeting. The state argues that the court met its obligations in this regard, but we disagree. Although the court notified the defendant of the *existence* of the in camera inquiry, it never discussed on the record the *contents* of that meeting. The defendant never was informed of the representations made by Klein and the prosecutor, nor was he made aware of the specific basis on which the court concluded that the conflict of interest would adequately be resolved by the severing of the codefendants' trials, appointment of new counsel only for Chandara Sam and immediate commencement of the defendant's trial, but not Chandara Sam's.

The state argues that other factors distinguish this case from *Lopez*. In *Lopez*, the court refused to pursue any analysis on the record regarding the conflict of interest issue. *State* v. *Lopez*, supra, 271 Conn. 729. In contrast, the court in the present case, prior to the in camera meeting, informed the defendant of his right to independent counsel. In the case before us, the defendant also was present when the prosecutor articulated the particular conflict of interest about which he was concerned. Unlike in *Lopez*, following the in camera meeting, the court canvassed the defendant as to why he no longer wanted to be represented by Klein. These distinctions, however, do not alter our analysis of whether the defendant was deprived of his constitutional right to be present at the in camera meeting. Even though the court, to its credit, conducted the foregoing colloquies on the record, these distinctions relate to the adequacy of the court's inquiry into the

conflict of interest, not to the defendant's due process right to be present at a critical stage of his prosecution.[12]

The court's subsequent canvassing of the defendant as to why he no longer wanted to be represented by Klein was not sufficient to remedy the improper deprivation of his right to be present during the in camera meeting. When canvassed by the court, the defendant articulated three reasons why he did not want to be represented by Klein. Although the court correctly concluded that none of those reasons were legally recognizable arguments as to why Klein should not be able to represent him, had the court informed the defendant of the contents of the in camera discussion regarding the conflict, the defendant may have been able to articulate a more specific basis on which to object to the court's decision. Without any specific knowledge of the contents of the in camera inquiry, the defendant could not make an informed objection to the court's ruling on how to resolve the conflict.

"A determination that the defendant's absence from a critical stage of the proceedings violated his constitutional rights does not end the inquiry that a reviewing court must conduct in deciding whether to order a new trial." Id., 732. Having concluded that the defendant was deprived of his right to be present during inquiry into the conflict of interest, we turn to the question of what remedy is appropriate for such a constitutional violation.

"Although the United States Supreme Court has noted that most constitutional errors are subject to a harmless error analysis . . . the Supreme Court has recognized . . . that, when the consequences of the deprivation of the defendant's constitutional right are necessarily unquantifiable and indeterminate, [the deprivation of

---

[12] Having concluded that the defendant was deprived of his right to be present at a critical stage of his prosecution, we do not reach the issue of whether the court's inquiry into the conflict of interest was sufficient.

that right] unquestionably qualifies as structural error. *Sullivan* v. *Louisiana,* [508 U.S. 275, 281–82, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993)]." (Citation omitted; internal quotation marks omitted.) *State* v. *Lopez,* supra, 271 Conn. 737–38. "Structural [error] cases defy analysis by harmless error standards because the entire conduct of the trial, from beginning to end, is obviously affected . . . ." (Internal quotation marks omitted.) Id., 733. "A structural error creates a defect in the trial mechanism such that, while it is virtually impossible to pinpoint the exact harm, it remains abundantly clear that the trial process was flawed significantly. For this reason, [e]rrors of this magnitude are per se prejudicial and require that the underlying conviction be vacated." (Internal quotation marks omitted.) Id., 739.

In *Lopez,* our Supreme Court concluded that the defendant's erroneous exclusion from the in camera inquiry into the conflict of interest constituted a structural error mandating reversal. Id., 731. In so concluding, the court stated with respect to the defendant that it was "impossible to know, had the defendant been present, whether he would have initiated further inquiry into the conflict, requested new counsel or requested that [defense counsel] testify on the defendant's behalf" and that there was no way to determine whether defense counsel's representation of the defendant was affected by the conflict. Id., 738. Guided by the court's reasoning in *Lopez* and our discussion, we conclude that the court's failure to inform the defendant of the substance of the in camera meeting constituted a structural error.[13] "If a reviewing court determines that the

---

[13] The case on which our Supreme Court relied in *Lopez* in concluding that the deprivation of the defendant's right to be present amounted to a structural error, *Campbell* v. *Rice,* 302 F.3d 892, 899–900 (9th Cir. 2002), subsequently was vacated and a different result was reached by the United States Court of Appeals for the Ninth Circuit sitting en banc, *Campbell* v. *Rice,* 408 F.3d 1166 (9th Cir.), cert. denied, 546 U.S. 1036, 126 S. Ct. 735, 163 L. Ed. 2d 578 (2005). The Ninth Circuit, sitting en banc, concluded that the defendant's injury was not a structural error but was subject to harmless

error is of the structural variety, the court's task is at an end." (Internal quotation marks omitted.) Id., 739. Accordingly, the judgment of conviction is reversed.

## II

We next review the defendant's claim that there was insufficient evidence[14] for the jury to find him guilty of robbery in the first degree in violation of § 53a-134 (a) (3)[15] and assault in the second degree in violation of § 53a-60 (a) (2).[16] His argument is threefold. With

---

error analysis. Id., 1172; see also *Bradley* v. *Henry*, 428 F.3d 811, 819 (9th Cir.) (concluding exclusion of defendant from on record, in camera discussion of conflict of interest constitutes exclusion from critical stage of prosecution and that defendant suffered harm as a result), vacated, rehearing ordered en banc, 432 F.3d 938 (9th Cir. 2005).

Recently, however, the United States Supreme Court in *United States* v. *Gonzalez-Lopez*, 548 U.S. 140, 150, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006), concluded that the erroneous deprivation of a defendant's sixth amendment right to *counsel of his choosing* amounted to a structural error warranting automatic reversal of his conviction, which we believe lends support to our Supreme Court's ruling in *Lopez* that the erroneous deprivation of a defendant's right to be present at a court's inquiry into defense counsel's conflict of interest is a structural error.

[14] Although we conclude that the defendant's conviction must be reversed and a new trial ordered, we address the defendant's insufficiency claims because a finding that the evidence was insufficient to convict him would result in a judgment of acquittal as to those counts. See *State* v. *Padua*, 273 Conn. 138, 178–79, 869 A.2d 192 (2005) ("[i]nterests of judicial efficiency, sound appellate policy and fundamental fairness require a reviewing court to address a defendant's insufficiency of the evidence claim prior to remanding a matter for retrial because of trial error"). The defendant alleges only that the evidence was insufficient to convict him of robbery in the first degree and assault in the second degree. He does not challenge the sufficiency of the evidence with respect to his conviction of burglary in the first degree, assault in the third degree and unlawful restraint in the first degree.

[15] Pursuant to General Statutes § 53a-134 (a), "[a] person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 . . . he or another participant in the crime . . . (3) uses or threatens the use of a dangerous instrument . . . ."

[16] General Statutes § 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when . . . (2) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument other than by means of the discharge of a firearm . . . ."

respect to the crime of robbery in the first degree, he claims that there was insufficient evidence (1) to prove that he acted with the intent to deprive the D'Amatos of their telephone permanently and (2) to demonstrate the requisite connection between the use of physical force against Stanley D'Amato and the taking of the cordless telephone from Diane D'Amato. With respect to both the crimes of robbery in the first degree and assault in the second degree, the defendant claims that there was insufficient evidence (3) to prove that a dangerous instrument was used in the robbery.[17] We do not agree that the evidence was insufficient to sustain his conviction of robbery in the first degree and assault in the second degree.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . . In conducting our review, we are mindful that the finding of facts,

---

[17] The defendant concedes that he did not preserve his claim at trial and seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). "Unpreserved sufficiency claims are reviewable on appeal because such claims implicate a defendant's federal constitutional right not to be convicted of a crime upon insufficient proof. . . . Our Supreme Court has stated that *Jackson* v. *Virginia*, [443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)], compels the conclusion that any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of [*Golding*]. . . . Thus . . . there is no practical reason for engaging in a *Golding* analysis of a claim based on the sufficiency of the evidence . . . ." (Internal quotation marks omitted.) *State* v. *Ashe*, 74 Conn. App. 511, 514, 812 A.2d 194, cert. denied, 262 Conn. 949, 817 A.2d 108 (2003).

the gauging of witness credibility and the choosing among competing inferences are functions within the exclusive province of the jury, and, therefore, we must afford those determinations great deference." (Citation omitted; internal quotation marks omitted.) *State* v. *Sanchez*, 92 Conn. App. 112, 118, 884 A.2d 1, cert. granted on other grounds, 276 Conn. 932, 890 A.2d 573 (2005).

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable

doubt require acceptance of every hypothesis of inno-
cence posed by the defendant that, had it been found
credible by the [finder of fact], would have resulted in
an acquittal. . . . On appeal, we do not ask whether
there is a reasonable view of the evidence that would
support a reasonable hypothesis of innocence. We ask,
instead, whether there is a reasonable view of the evi-
dence that supports the [finder of fact's] verdict of
guilty." (Internal quotation marks omitted.) *State* v. *Led-
better*, 275 Conn. 534, 542–43, 881 A.2d 290 (2005), cert.
denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d
537 (2006).

## A

The defendant claims that there was insufficient evi-
dence to prove an essential element of robbery in the
first degree, namely, that he intended to deprive the
D'Amatos of their telephone permanently. He argues,
in addition, that the state failed to prove beyond a rea-
sonable doubt the requisite connection between his
use of force on Stanley D'Amato and the taking of the
telephone. We do not agree.

The state's theory of the case with respect to the
robbery count was that the defendant was an accom-
plice to San's taking of the cordless telephone from
the D'Amato residence. The state theorized that the
defendant used force against Stanley D'Amato in order
to facilitate San's taking of the telephone. The defendant
argues that the evidence adduced at trial fails to support
that theory. Specifically, the defendant claims that
although the evidence may suggest that San intended
to carry out a permanent taking of the telephone, there
was no independent intent on the part of the defendant
to take the telephone.

The defendant correctly points out that to convict
him of robbery, the state was required to prove beyond

a reasonable doubt that the defendant intended to permanently deprive the D'Amatos of their telephone. "[A]ccessorial liability pursuant to [General Statutes] § 53a-8[18] requires the defendant to have the specific mental state required for the commission of the substantive crime." *State* v. *Martinez*, 278 Conn. 598, 615, 900 A.2d 485 (2006). "Consequently, to establish a person's culpability as an accessory to a particular offense, the state must prove that the accessory, like the principal, had committed each and every element of the offense. (Internal quotation marks omitted.) Id., 618. "A specific intent to deprive or to misappropriate is an essential element of larceny." *State* v. *Pulley*, 46 Conn. App. 414, 418, 699 A.2d 1042 (1997). Larceny is a lesser included offense and therefore a required element of the crime of robbery, the crime of which the defendant was convicted.[19]

It is well settled, however, that the question of intent is purely a question of fact. See, e.g., *State* v. *Watson*, 50 Conn. App. 591, 605, 718 A.2d 497, cert. denied, 247 Conn. 939, 723 A.2d 319 (1998), cert. denied, 526 U.S. 1058, 119 S. Ct. 1373, 143 L. Ed. 2d 532 (1999), cert. dismissed, 255 Conn. 953, 772 A.2d 153 (2001). "The state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking

---

[18] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[19] General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proven by circumstantial evidence. . . . Intent may be and usually is inferred from conduct. . . . [W]hether such an inference should be drawn is properly a question for the jury to decide." (Internal quotation marks omitted.) Id.

The jury reasonably could have inferred from the evidence presented that the defendant intended to deprive the D'Amatos of their telephone permanently, and, despite the defendant's contention otherwise, we do not think it was unreasonable for the jury to infer that the defendant's use of force against Stanley D'Amato was for the purpose of facilitating the larceny of the telephone.[20] The jury reasonably could have inferred from the testimony of Diane D'Amato that the defendant had participated in restraining and assaulting Stanley D'Amato.[21] The attack on Stanley D'Amato occurred as he was attempting to intervene between his mother and San as San was beating her with the telephone. It would not be unreasonable to infer that the defendant intended for the telephone, a key piece of evidence linking him to the crime, to be taken from

[20] "The use or threat of force occurs in the course of [a] larceny if it occurs during the continuous sequence of events surrounding the taking or attempted taking, even though some time immediately before or after . . . ." (Internal quotation marks omitted.) *State* v. *Wallace*, 56 Conn. App. 730, 742, 745 A.2d 216, cert. denied, 253 Conn. 901, 753 A.2d 939 (2000).

[21] Diane D'Amato testified with certainty both on direct and cross-examination that she observed both the defendant and Chandara Sam attacking Stanley D'Amato on the couch. Although Stanley D'Amato testified that he kept his head down to protect himself and that he did not notice who was attacking him, that Chandara Sam had been the one initially to push him onto the couch and that the last he had seen of the defendant was when the defendant was still standing in a doorway, "[i]n evaluating evidence that could yield contrary inferences, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence." (Internal quotation marks omitted.) *State* v. *Dumas*, 54 Conn. App. 780, 785, 739 A.2d 1251, cert. denied, 252 Conn. 903, 743 A.2d 616 (1999).

the house. We conclude, therefore, that there was suffi-
cient evidence for the jury to conclude that the defen-
dant used force against Stanley D'Amato for the purpose
of facilitating the larceny of the telephone.

## B

The defendant also claims that there was insufficient
evidence in the record to prove the "dangerous instru-
ment" element of robbery in the first degree[22] and
assault in the second degree.[23] We are not persuaded.

"Dangerous instrument" is defined by General Stat-
utes § 53a-3 (7) as "any instrument, article or substance
which, under the circumstances in which it is used or
attempted or threatened to be used, is capable of caus-
ing death or serious physical injury . . . ." In its substi-
tute information, the state alleged with specificity that
a knife was the dangerous instrument used in the com-
mission of the robbery of the telephone and the assault
on Stanley D'Amato.[24] The defendant claims that the
state may obtain a conviction on the robbery and assault
counts only if the offenses are proved as they were
charged in the information and submitted to the jury.
He contends that the state, by specifying that a knife
was used in the commission of robbery in the first
degree and assault in the second degree, was required
to prove that it was a knife, and not just any other
dangerous instrument, that was used.[25]

---

[22] See footnote 15.

[23] See footnote 16.

[24] Specifically, the substitute information charged that the defendant "stole
certain property from one Diane D'Amato, and in the course of the commis-
sion of the crime he used a dangerous instrument, to wit: a knife, in violation
of Section 53a-134 (a) (3) of the Connecticut General Statutes," and that
the defendant "with intent to cause physical injury to one Stanley D'Amato,
caused such injury to the said Stanley D'Amato by means of a dangerous
instrument, to wit: a knife, in violation of Section 53a-60 (a) (2) of the
Connecticut General Statutes."

[25] The state argues, in response, that there was sufficient evidence to
prove beyond a reasonable doubt that a knife was the dangerous instrument
used in the commission of the offenses. Despite the state's concession that
it was bound by the specific facts set forth in the information, as we will

We agree with the defendant that, generally speaking, "the state is limited to proving that the defendant has committed the offense in substantially the manner described in the information." (Internal quotation marks omitted.) *State* v. *Martin*, 56 Conn. App. 98, 108, 741 A.2d 337 (1999), cert. denied, 252 Conn. 926, 746 A.2d 790 (2000); *State* v. *Evans*, 44 Conn. App. 307, 313, 689 A.2d 494, cert. denied, 240 Conn. 924, 692 A.2d 819 (1997). Despite this general principle, however, both this court and our Supreme Court have made clear that "[t]he inclusion in the state's pleading of additional details concerning the offense does not make such allegations essential elements of the crime, upon which the jury must be instructed." *State* v. *Morrill*, 197 Conn. 507, 551, 498 A.2d 76 (1985); *State* v. *Martin*, supra, 108; *State* v. *Evans*, supra, 313. Our case law makes clear that the requirement that the state be limited to proving an offense in substantially the manner described in the information is meant to assure that the defendant is provided with sufficient notice of the crimes against which he must defend.[26] As long as this notice requirement is satisfied, however, the inclusion of additional details in the charge does not place on the state the obligation to prove more than the essential elements of the crime.[27]

discuss, we disagree that the state was limited to proving only that a knife was the dangerous instrument used.

[26] We note that the defendant makes no claim on appeal that he was not afforded notice of the charges against him.

[27] Of course, there may be instances in which additional details added to the information are so dissimilar from the theory of the case presented at trial that the proper conclusion will be that the defendant was not given adequate notice of the charge against which he was required to defend. An example of this is *State* v. *Padua*, 273 Conn. 138, 147, 869 A.2d 192 (2005), which involved a charge of risk to injury to a child under General Statutes (Rev. to 1999) § 53-21 (1). Our Supreme Court concluded that because the informations charged the defendants with specific conduct amounting to a violation of § 53-21 (1), the state was required to prove that *particular* conduct, although there did exist other conduct that could form the basis for proving a violation of § 53-21 (1). *State* v. *Padua*, supra, 148–49.

Illustrative of this principle is *State* v. *Killenger*, 193 Conn. 48, 51, 475 A.2d 276 (1984). In that case, two defendants were charged with robbery in the first degree and assault in the first degree. Id., 50. Both offenses contained the element that a "dangerous instrument" was used in the commission of the crime. The state did not list the specific dangerous instrument in the information, but specified in the bill of particulars that the instrument used was a hammer. Id., 51. At trial, the only evidence presented was that the weapon used by the defendants was a flashlight. Id. The defendants were convicted, and, on appeal, they, like the defendant in this case, argued that the state was limited to proving the offenses in the exact manner described, including the use of the particular dangerous instrument specified. Id.

Our Supreme Court disagreed with this argument, stating: "[A]lthough a pleading alleges that a specified instrument was used in committing the offense[s], it is not necessary to prove that the particular instrument or even the exact kind of instrument was used. The proof need only show that the instrument used was of the same generic character, and that the nature of the violence and the injury received were the same. 3 Wharton's Criminal Procedure (12th Ed.) 506." (Internal quotation marks omitted.) *State* v. *Killenger*, supra, 193 Conn. 52–53. With respect to the rule that the state is limited to proving that the defendant committed the offense in substantially the manner described, the court stated: "Where . . . the weapon designated in the bill of particulars and the one proved at trial are not identical, but rather of the same nature and character, this circumstance does not constitute a fatal variance. . . . Once such a bill of particulars has been filed . . . the state is limited to proving that the defendant has committed the offense in substantially the manner described. . . . We conclude that this substantiality

test is met . . . [because] either instrument involved had the potential character of a dangerous instrument capable of inflicting the same type of wound." (Citations omitted; internal quotation marks omitted.) Id., 55.

The reasoning set forth by our Supreme Court in *Killenger* also has been applied by this court. In *State v. Martin*, supra, 56 Conn. App. 107–108, for example, the defendant claimed on appeal that the evidence was insufficient to convict him of disorderly conduct in violation of General Statutes § 53a-182 (a) (2) in light of the specificity of the state's charging document. The charging document listed the date and the street address where the alleged disorderly conduct occurred, and the defendant argued that because of the specific address listed in the charge, the jury could consider only the evidence relating to the events that occurred at that location, and that the evidence was insufficient to support his conviction. *State v. Martin*, supra, 107–108. This court disagreed, restating the principle that "[t]he inclusion in the state's pleading of additional details . . . does not make [those additional details] essential elements of the crime," and concluding that "[t]hat rule of law, combined with our conclusion that the evidence supports the finding that the elements of the crime charged were proved beyond a reasonable doubt, defeats the defendant's argument." (Internal quotation marks omitted.) Id., 108; see also *State v. Harris*, 11 Conn. App. 397, 399 n.2, 403, 527 A.2d 724 (despite information specifically listing in charge of robbery in first degree sawed-off shotgun as deadly weapon used, "[t]he state was not limited to proving that the deadly weapon used in the commission of the crime was a sawed-off shotgun"), cert. denied, 205 Conn. 801, 529 A.2d 719 (1987).

Having established that the state was required to prove only that a dangerous instrument of the same generic character as a knife was used in the commission

of the robbery and assault; see *State* v. *Killenger*, supra, 193 Conn. 53; we conclude that in the present case, the evidence permitted the jury reasonably to conclude that such a dangerous instrument was used in the commission of the two offenses.

The defendant correctly points out that the D'Amatos testified that they did not observe any weapon present at their home on the night of the incident and that Stanley D'Amato stated that he was unaware that he had been cut until after the three men had fled and he noticed that he was bleeding. Werdmann, the physician who had treated Stanley D'Amato upon his admission to Bridgeport Hospital, had the opportunity to examine his two lacerations, however. At trial, Werdmann testified that the lacerations were consistent with that of a knife wound. Although Werdmann could not with absolute certainty rule out the possibility that the lacerations were caused by some sharp instrument other than a knife, he did testify that the instrument used in the attack was one capable of causing death or serious physical injury. See General Statutes § 53a-3 (7). We conclude that this testimony was a sufficient basis on which the jury reasonably could have concluded that a dangerous instrument of the same generic character was used in the attack on Stanley D'Amato.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.